## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-32 (FYP)** |
| **v.** | : | |
| | : | |
| **BLAS SANTILLAN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Blas Santillan to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

> It seems like you're that weak, because I'm the only one that was willing to do something! I'm the only one that was willing to kick that door! Who else is willing to storm in there? No one!

This is the statement made by Defendant Blas Santillan on January 6, while standing outside the Columbus Doors, speaking to his fellow rioters while the assault on the Capitol was taking place.

Blas Santillan, a 27-year-old waiter from Clayton, Georgia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

Defendant Santillan pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a substantial sentence of 45 days' incarceration and 36 months' probation is appropriate in this case because Santillan (1) entered the Capitol Building by storming through the Rotunda Doors with others just 8 minutes after the doors were breached and forcing his way past United States Capitol Police ("USCP") officers, who were trying to keep the mob from entering; (2) paraded and protested around the Rotunda for approximately 25 minutes, where he observed violent clashes with police, shouted, and raised his arm in celebration of the riot; (3) used his cell phone to post videos of himself inside the Capitol during the riot in real time to SnapChat—a social media platform; (4) returned to the Rotunda Doors, which police had secured, and encouraged others outside to "storm in there" after Metropolitan Police Department ("MPD") officers in riot gear forced him and other rioters out of the building; and (5) has a troubling criminal history, which includes prior convictions for statutory rape, DUI, and willful obstruction of police officers.

The Court must also consider that Santillan's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building and disrupt the proceedings. Santillan's actions and those of his fellow rioters enabled the breach of

---

[1] Although the Statement of Offense in this matter, filed on May 17, 2022 (ECF No. 34 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Santillan's crime support a sentence of 45 days' incarceration and 36 months' probation in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.

### *The Breach of the Rotunda Doors*

While the first breach of the Capitol occurred on the west side, the east side breach occurred not long after. Rioters pushed past barricades and, as shown in the phot below, pushed the Capitol Police up the steps, towards the Rotunda Doors.



Rioters eventually made it all the way up the steps to the doors. A group of police officers, some carrying riot shields, attempted in vain to disperse the crowd, but the crowd was too large to be moved. The crowd, meanwhile, chanted "Stop the steal," "Whose house?  Our house!" and "USA!" A loud bang was heard, and a plume of smoke issued from near the door, at around 2:24 p.m., presumably from the discharge of a smoke or tear gas grenade.

At around the same time, from inside the Capitol Building, another rioter approached the eastern Rotunda Doors and used his shoulder to force them open. An employee of the House Sergeant at Arms tried to stop the rioters outside from entering, but he was overwhelmed by other rioters inside the building and forced away from the door. Rioters outside the doors tried to jam a flag through the door to keep it open. Other members of the exterior crowd were assaulting police officers who stood with their backs to the eastern Rotunda Doors, defending it.  Some carried out this assault using chemical spray.[2]

After the rioters inside forced the door open, they pulled a police officer through the door, then worked to clear a logjam of bodies outside. Moments later, rioters began to pour into the Capitol. Rioters fought officers to keep the door open, pushing and pulling them out of the way, trying to jam their bodies in the doorframe. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.

While officers stood guard at the doors, and then barricaded the door with benches, tensions outside remained high. Rioters outside continued yelling and chanting and skirmishing with

---

[2] *See* https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec, at timestamp 0:46.

officers, trying to breach the doors again. They would soon breach the Rotunda Doors a second time.[3] As heard in the video, rioters nearby yelled "take the windows out!" and "charge!"

At around the same time, rioters inside the building found the benches blocking the Rotunda Doors and pulled them away. Three police officers rushed in and blocked the doors, but the number of rioters inside the East Foyer grew until, as shown in the photo below, the group eventually overwhelmed the officers and pushed through them, opening the doors again, with the aid of flagpoles they shoved into the opening. Alarms blared.[4]

With that backdrop we turn to Santillan's conduct and behavior on January 6.



*Rioters opening the Rotunda Doors at approximately 2:38 p.m.*

*Defendant Santillan's Role in the January 6, 2021 Attack on the Capitol*

Santillan had travelled to Washington, D.C. on January 5, 2021, from his home in Georgia to protest Congress's certification of the Electoral College. ECF 34 ¶ 8. At some point that day, he

---

[3] *See* https://youtu.be/Mkm41FMH39g?t=2995, at timestamp 50:47.
[4] *See, e.g.,* https://www.youtube.com/watch?v=jBRJmnvFfo8, at timestamp 13:13.

had joined the rioters that made their way to the Rotunda Doors on the east side of the Capitol Building. At approximately 2:46 p.m., Santillan pushed his way through the Rotunda Doors, while USCP officers were still trying to keep rioters from entering there. Santillan ignored the officers' presence and pushed past them to enter the Capitol Building. *See* Video Exhibit 1. As explained above, and as seen in Video Exhibit 1, in the minutes leading up to Santillan's entrance into the Capitol Building, rioters were clashing with and pushing against the officers trying to keep the mob out. Thus, notwithstanding the violence ahead of him, Santillan persisted and continued to push forward to enter the Capitol Building.



*Santillan (circled in red) sliding past MPD officers (circled in green).*

From approximately 2:46 p.m. to 3:10 p.m., Santillan paraded through the Rotunda of the Capitol Building, often shouting, with dozens, perhaps hundreds, of other rioters. ECF 34 ¶ 10. While inside the Rotunda, Santillan used his cell phone to post videos to SnapChat—a social media platform with the capability of deleting photos and videos shortly after they are sent or posted.[5]

---

[5] A tipster provided the FBI with cell phone video that captured Santillan's SnapChat videos being played on the tipster's phone. As discussed further below, the original videos taken by Santillan were not recovered from his SnapChat account.

Between approximately 3:05 p.m. and 3:10 p.m., numerous rioters engaged in physical altercations with the police officers. Although Santillan did not participate in the violence, he observed rioters clashing with police officers and remained in the Rotunda until MPD officers in riot gear directed him and fellow rioters out of the building. *Id.*[6] Santillan knew that he did not have permission to enter the Capitol Building. *Id.* ¶ 12.

 

*Santillan's videos on SnapChat.*



*Santillan shouting in the Rotunda.*

---

[6] *See also* https://www.youtube.com/watch?v=paM-muN0M7g, at timestamp 7:50-10:10.



*Santillan celebrating in the Rotunda.*



*Rioters clashing with police officers in the Rotunda at 3:09 p.m.*



*Santillan exiting the Rotunda at 3:11 p.m.*

At approximately 4:24 p.m., after Santillan had exited the Capitol Building and police officers secured the Rotunda Doors, Santillan remained outside the Rotunda Doors with a large group of rioters. Santillan shouted at the rioters and encouraged them to enter the Capitol Building. *See* Video Exhibit 2. Specifically, he shouted:

> It seems like you're that weak, because I'm the only one that was willing to do something! I'm the only one that was willing to kick that door! Who else is willing to storm in there? No one! . . . Who are you! Who are you! You're not America! You're not America! . . . Americans do not sit by while people take your rights! You are lazy Americans! That is what you are! You are used to sitting on your couch, and watching your Netflix, and listening to your shows, and watching YouTube! You do not know what freedom is. . . . Freedom is doing what you want! Freedom! Let's go! . . . Is this your house?

On February 18, 2021, the FBI attempted to interview Santillan about his presence in the Capitol Building on January 6, 2021. Santillan declined to speak with the agents without an

attorney present. FBI agents obtained a search warrant for Santillan's SnapChat account, but none of the videos from the Capitol Building were retained on that account.

On July 26, 2022, pursuant to the terms of the plea agreement, the FBI conducted another interview of Santillan. Santillan stated that he travelled to Washington, DC on January 5, 2021 out of interest and curiosity in the political environment, and not because of any strong political belief. Notwithstanding the fact that he observed at least two rioters get pepper sprayed, Santillan claimed that the police officers in the Rotunda did not have an issue with his unauthorized presence there. Further, when asked if he would storm the Capitol all over again if given the opportunity to relive January 6, he stated that he probably would not enter the building, but again reiterated that the police officers did not seem bothered by the rioters' presence.

*The Charges and the Plea Agreement*

On August 10, 2021, the United States charged Santillan by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 23, 2021, law enforcement officers arrested him in Clayton, Georgia. On January 24, 2022, the United States charged Santillan by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 17, 2022, pursuant to a plea agreement, Santillan pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Santillan agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Santillan now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Santillan faces up to six months of imprisonment and a fine of up to $5,000. Santillan must also pay restitution under the terms of his

or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, *id.* § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, *id.* § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing

and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Santillan's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Santillan personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Santillan is therefore not a mitigating factor in misdemeanor cases.

 The mob that breached the Rotunda Doors just minutes before Santillan's entry, and the mob that pushed their way past police just seconds before Santillan's entry show that Santillan observed the violence at the Capitol Building, but nonetheless decided to enter.  Once inside, he celebrated by shouting and raising his fist in the air.  Santillan remained in the Rotunda for nearly 25 minutes knowing that he was not allowed to be in there.  He observed more violence inside the Rotunda as rioters clashed with police officers. It was not until police in riot gear entered that Santillan exited the building. After he exited, not only did he celebrate the violence of that day, but he encouraged others to try to gain entry to the Capitol Building. He bragged about "kick[ing]

that door" and criticized those who were not willing to take more action on January 6. These statements clearly show that Santillan was no passive bystander to the attack on the Capitol but an eager participant. And by posting his videos to SnapChat, he was able to broadcast to his followers his actions inside the Capitol that day, while at the same time keeping his videos hidden from law enforcement.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days' incarceration and 36 months' probation in this matter.

### B. The History and Characteristics of Santillan

As set forth in the Presentence Report ("PSR"), Santillan has prior criminal convictions, several of which led to his incarceration after violating the conditions of his probation.  At the age of 18, Santillan was convicted of statutory rape and initially sentenced to 12 months' probation. PSR ¶ 21. He violated his probation twice and was subsequently sentenced to 60 days in jail and then sentenced to serve the balance of his probation in jail. *Id.* That same year, Santillan was arrested and charged with DUI. PSR ¶ 22. He was initially sentenced to 12 months' probation, but the court then sentenced him to 550 days in jail for violating probation. *Id.* In 2015 and 2016, Santillan received two 12-month probationary sentences for driving without a license and reckless driving, respectively. PSR ¶¶ 23, 24.  On September 11, 2018, Santillan was sentenced to 6 months' probation for willful obstruction of law enforcement. PSR ¶ 25. Several months later, Santillan was ordered to serve the remainder of his probation in jail for again violating his probation. *Id.*

Santillan's criminal history shows that probationary sentences have been ineffective at deterring future criminal conduct. Thus, in this case, there is a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6th showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://www.justsecurity.org/wp-content/uploads/2021/12/january-6-clearinghouse-fbi-director-christopher-wray-house-oversight-june-15-2021.pdf.

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that Mr. Hodgkins and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As addressed above, Santillan's criminal history is significant. Most notable is his multiple violations of probation. This alone suggests that a probationary sentence will not be sufficient to deter Santillan from additional criminal conduct. Moreover, his forceful entry into the Capitol

Building and his statements outside of the Capitol Building (after having already been kicked out) demonstrate his lack of remorse for having entered, despite observing the violence against police inside.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Santillan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Santillan convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[9] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Santillan has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges have imposed sentences of incarceration on other defendants who also pled guilty to violating § 5104(e)(2)(G) with criminal histories who stormed past police, remained in the Capitol Building for more than 20 minutes, observed violence, and expressed no remorse.

In *United States v. Mark Simon*, 21-cr-67 (ABJ), the court sentenced the defendant, who also had a serious criminal history and also pushed through the Rotunda doors, to 35 days in prison. In *United States v. Joshua Wagner*, 21-cr-310 (ABJ), the defendant, entered through a broken window, called the police traitors, encouraged other rioters to "hold the line" against the police, and, like Santillan, ignored police officers' orders. The court sentenced Wagner to 30 days' imprisonment.

Jeffrey Smith was one of the defendants who helped remove the iron benches barricading the Rotunda Doors several minutes before Santillan entered. *See United States v. Jeffrey Smith*,

21-cr-290 (RBW). Smith took video of himself while entering the Capitol chanting, "We ain't going take it," and "Let's fucking go patriots." He made a victorious fist pump after helping breach the Rotunda Doors to allow the mob of rioters, including Santillan, to enter the Capitol. The government sought a five-month sentence of incarceration for Smith. The court sentenced him to 3 months' incarceration and 24 months' probation. *See also United States v. Paul Westover*, 21-cr-697 (JEB) (45 days' imprisonment for defendant who stormed past a group of police officers, made it to the Speaker's suite, celebrated the criminal conduct of others, and deleted photos and videos from his Facebook account and cell phone); *United States v. Clifford Meteer*, 21-cr-630 (CJN) (60 days' imprisonment for defendant who followed mob that overran police, remained in Capitol for 30 minutes, and made statements on Facebook and television showing lack of remorse); *but see United States v. Thomas Conover*, 21-cr-743 (FYP) (this Court imposing a sentence of 36 months' probation for defendant with *no criminal history* who, like Santillan, pushed through Rotunda Doors).

Regarding criminal history, two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants. *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). In that case, the government requested 30 days of incarceration and $500 in restitution. Both Bauer and Hemenway entered guilty pleas to the same count as Santillan (one count of 40 U.S.C. § 5104(e)(2)(G)). Judge Chutkan sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution. To support its request for 30 days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault police officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people

inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately seventeen minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault police, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved operating a motor vehicle while under the influence of alcohol or drugs in 1999, when he was 21 years old; possession of anhydrous ammonia and vandalism in 2005; possession of methamphetamine, manufacturing methamphetamine and related charges in 2005; and unlawful possession of meth precursor in 2006. *Id.* at 11-12. Hemenway's criminal history dated back to 2004 and involved a conviction for sexual battery and criminal confinement in 2006. 21-cr-49, ECF No. 32 at 11. Santillan's criminal history involves multiple alcohol-related offenses, including DUI and reckless driving, statutory rape, and willful obstruction of law enforcement.

Like Santillan, neither Bauer nor Hemenway was personally involved in acts of violence or destruction, although all three did see rioters who were actively engaging in violence. Bauer admonished other rioters not to assault police, and Hemenway stated they admonished a rioter they saw trying to break a window. Contrarily, Santillan actually encouraged other rioters to kick down the Rotunda Doors and enter. The sentences requested and imposed for Bauer and Hemenway show that the requested sentence for Santillan avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("The Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C.

April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS) (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS) (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[10] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### VI.   A sentence imposed for a petty offense may include both incarceration and probation.

#### A.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

---

[10] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months' incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

court may impose a term of continuous incarceration that exceeds two weeks[11] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[12] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this

---

[12] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* U.S.S.G. § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual

to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")
(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th
ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time
to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only
"different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section
3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state
"the same *offense* or a different offense that is not a petty offense," which would imply that the
final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase
"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated
phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a
petty offense" solely to "different offense," the "typical way in which syntax would suggest no
carryover modification" would be some language that "cut[s] off the modifying phrase so its
backward reach is limited." *Id.* at 148-49.  And while the indefinite article "a" might play that
role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with
icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article
before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL
768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry
the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty
offenses is sensible because sentencing courts cannot impose supervised release on petty-offense
defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914,

at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict

constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover,

28

under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Santillan pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Santillan to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      *s/ Christopher D. Amore*
CHRISTOPHER D. AMORE
Assistant United States Attorney
N.Y. Bar No. 5032883
Capitol Riot Detailee
970 Broad Street, Suite 700
Newark, NJ 07102

**<u>CERTIFICATE OF SERVICE</u>**

On this 1st day of August, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>_s/ Christopher D. Amore_</u>
CHRISTOPHER D. AMORE
Assistant United States Attorney
N.Y. Bar No. 5032883
Capitol Riot Detailee
970 Broad Street, Suite 700
Newark, NJ 07102